Evan J. Smith
BRODSKY & SMITH, LLC
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone:    516.741.4977
Facsimile:     516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETER WONG,<br><br>       Plaintiff,<br><br>       v.<br><br>GOLDEN NUGGET ONLINE GAMING, INC., TILMAN J. FERTITTA, RICHARD H. LIEM, STEVEN L. SCHEINTHAL, G. MICHAEL STEVENS, MICHAEL CHADWICK, SCOTT KELLY, DRAFTKINGS INC., DUKE MERGER SUB, INC., and GULF MERGER SUB, INC..<br><br>       Defendants. | Case No.:<br><br>COMPLAINT FOR:<br><br>(1) Violation of § 14(a) of the Securities Exchange Act of 1934<br>(2) Violation of § 20(a) of the Securities Exchange Act of 1934<br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, Peter Wong ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1.     Plaintiff brings this action against Golden Nugget Online Gaming, Inc. ("Golden Nugget" or the "Company"), and the Company's Board of Directors (the "Board" or the "Individual Defendants") for violations of Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of Defendants' efforts to sell the Company to DraftKings

Inc. ("Parent" or "DraftKings") through merger vehicles Duke Merger Sub, Inc. and Gulf Merger Sub, Inc. ("Merger Subs" and together with Golden Nugget, the Board, and Parent, the "Defendants") as a result of an unfair process for an unfair price, and to enjoin an upcoming consummation on an all stock proposed transaction valued at approximately $1.56 billion (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in an August 9, 2021, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").   Under the terms of the Merger Agreement, Golden Nugget will become an indirect wholly-owned subsidiary of Parent, a subsidiary of the DraftKings.  Golden Nugget public stockholders will receive, in exchange for each share of Golden Nugget common stock they own, 0.365 shares of DraftKings Class A common stock.

3.      Thereafter, on October 8, 2021, Defendants caused a Registration Statement on Form S-4 to be filed with the SEC in support of the Proposed Transaction (the "Registration Statement").

4.      The Proposed Transaction is unfair for a number of other reasons.  Most notably, the Proposed Transaction is a foregone conclusion, with majority stockholder, CEO and Chairman of the Board Fertitta owning approximately 79.9% of the outstanding voting stock of the Company. Moreover, no "majority-of-the-minority" provision was included in the Proposed Transaction, and the Registration Statement indicates that Defendant Fertitta has already tendered the requisite approval necessary for the Proposed Transaction to proceed.

5.      Additionally, the Registration Statement describes an insufficient process in which the Board rushed through an inadequate "sales process" that did not include the creation of an independent committee of disinterested directors to oversee the process.

6.      Next, it appears as though the Board has entered the Proposed Transaction to procure for itself and senior management of the Company significant and immediate benefits with no thought to Plaintiff, as well as the Company's public stockholders.  For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange all Company equity awards for the merger consideration.

7.      On October 8, 2021, and in violation of the Exchange Act, Defendants caused to be filed the materially deficient Registration Statement with the SEC.  The Registration Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed and rational decision of whether to seek appraisal for his shares rather than accepting the consideration proffered under the terms of the Proposed Transaction, and is thus in violation of the Exchange Act.  As detailed below, the Registration Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Golden Nugget and DraftKings, provided by Golden Nugget and DraftKings to the Company Board's financial advisors Jefferies, LLC ("Jefferies") and Spectrum Gaming Capital LLC ("SGC") and Draft Kings financial advisor Raine Advisors LLC ("Raine") ; and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinions created by SGC, Jefferies, and/or Raine, if any, and provide to the Company and the Board.

8.      Accordingly, this action seeks to enjoin the Proposed Transaction.

9.      Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.  This action seeks to enjoin the Proposed Transaction.

## PARTIES

10.     Plaintiff is a citizen of New York and, at all times relevant hereto, has been a Golden Nugget stockholder.

11.     Defendant Golden Nugget is a leading online gaming company that is considered a market leader by its peers and was first to bring Live Dealer and Live Casino Floor to the United States online gaming market.  Golden Nugget is incorporated under the laws of the State of Delaware and has its principal place of business at 1510 West Loop South, Houston, TX 77027. Shares of Golden Nugget common stock are traded on the Nasdaq Stock Exchange under the symbol "GNOG."

12.     Defendant Tilman J. Fertitta ("Fertitta") has been a Director of the Company at all relevant times.  In addition, Fertitta serves as the Company's Chairman of the Board and Chief Executive Officer ("CEO").

13.     Defendant Richard H. Liem ("Liem") has been a director of the Company at all relevant times.

14.     Defendant Steven L. Scheinthal ("Scheinthal") has been a director of the Company at all relevant times.

15.     Defendant G. Michael Stevens ("Stevens") has been a director of the Company at all relevant times.

16.     Defendant Michael Chadwick ("Chadwick") has been a director of the Company at all relevant times.

17.     Defendant Scott Kelly ("Kelly") has been a director of the Company at all relevant times.

18.     Defendants identified in ¶¶ 12 - 17 are collectively referred to as the "Individual Defendants."

19.     Defendant DraftKings is a digital sports entertainment and gaming company created to fuel the competitive spirit of sports fans with products that range across daily fantasy, regulated gaming and digital media. DraftKings is a Nevada corporation with its headquarters in Boston, MA. Shares of DraftKings common stock are traded on the Nasdaq Stock Exchange under the symbol "DKNG."

20.     Defendants Merger Subs are affiliated entities with DraftKings created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

22.     Personal jurisdiction exists over each defendant because the Company maintains its principal place of business in this district, the defendants conduct business in or maintain operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company's stock trades on the Nasdaq stock exchange which is headquartered in this District.

## SUBSTANTIVE ALLEGATIONS

### Company Background

24.     Golden Nugget operates as an online gaming and digital sports entertainment company. It offers patrons to play their favorite casino games and bet on live-action sports events in New Jersey and Michigan. The Company was the recipient of 15 eGaming Review North America Awards, including the coveted "Operator of the Year" award in 2017, 2018, 2019 and 2020. Fertitta Entertainment, Inc. is the holding company through which Defendant CEO Fertitta holds substantially all of his assets and the parent company of Golden Nugget/Landry's, a multinational, diversified gaming, restaurant, hospitality and entertainment company based in Houston, Texas. Golden Nugget/Landry's gaming division includes the renowned Golden Nugget Hotel and Casino concept, with locations in Las Vegas and Laughlin, NV; Atlantic City, NJ; Biloxi, MS; and Lake Charles, LA.

25.     The Company reported positive financial results in its most recent Press Release for the First Quarter 2021 Financial Results. For example, the Company reported revenues of $26.7 million, representing an increase of 54.2%, compared to $17.3 million during the first quarter of 2020.

26.     Speaking on the positive results, Golden Nugget President Thomas Winter commented in the May 17, 2021 Press Release, "We are very pleased to start 2021 with such strong results across both our established and new expansion markets. We believe we are well positioned

to capitalize on the significant and fast growing market for iGaming across North America. We expect that 2021 will be a milestone year for the Company as we are on target to be live in 6 states by the end of the year, including all 4 key iGaming states." Defendant CEO Fertitta added, "The future is very bright for Golden Nugget Online Gaming as we achieved another record quarter in revenue and with our newly announced partnerships in Colorado and Iowa, we now have market access in 12 states, representing approximately 29% of the US population."

27.     The sustained financials and optimism are not an anomaly, but rather, are indicative of a trend of continued success and future potential success by Golden Nugget.   Clearly, the Company is likely to have tremendous future success and should command a much higher consideration than the amount contained within the Proposed Transaction.

28.     Despite this potential, the Individual Defendants have caused Golden Nugget to enter into the Proposed Transaction for insufficient consideration.

***The Flawed Sales Process***

29.     As detailed in the Registration Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company by any means possible no matter the price.

30.     First, the Registration Statement reveals that the consummation of the Proposed Transaction is a foregone conclusion as the Company Board failed to include a "majority-of-the-minority" voting provision in the Merger Agreement to protect the rights of minority Company stockholders like Plaintiff.   As such, Defendant Fertitta's approximately 79.9% share of the outstanding voting stock of the Company is sufficient to approve the Proposed Transaction, and

the Registration Statement reveals that such approval has already been delivered as of August 10, 2021.

31.     Notably, while the Registration Statement indicates that a special committee of the Golden Nugget board was composed of "independent" directors to run the sales process, it also indicates that all such independent directors "serve or are expected to serve as directors on the boards of other entities controlled by Mr. Fertitta and his affiliates." Such relationships with CEO and Defendant Fertitta undermine and call into question the actual independence of the special committee members.

32.     The Registration Statement also fails to provide adequate information as to why the neither the special committee or the full Golden Nugget Board negotiated to include a collar mechanism to ensure that the stock consideration granted to Company stockholders such as Plaintiff under the terms of the Proposed Transaction remain within a realm of reasonableness.

33.     Moreover, the Registration Statement fails to indicate why it was necessary for the Company to engage both SGC and Jefferies as financial advisors. Furthermore, the Registration Statement fails to indicate how much consideration Jefferies will receive in exchange for their services related to the Proposed Transaction – this is especially problematic both due to the fact that Jefferies seemingly did not provide a fairness opinion to the Board and that the Registration Statement reveals that Jefferies or its affiliated entities own approximately 8.0% of the outstanding stock of the Company and holed 1.9% of the outstanding voting power of the Company.

34.     The Registration Statement also fails to indicate why no proper market check was performed by the Board, the special committee, or any financial advisor on the formers' behalf. Notably, the Registration Statement reveals that no concerted outreach efforts took place and that besides DraftKings, the Company only contacted two other potentially interested third parties.

35.     In addition, the Registration Statement is silent as to the nature of the confidentiality agreements entered into between the Company and potentially interested third parties, including DraftKings, throughout the sales process, if any, and whether these agreements differ from each other, and if so in what way.   The Registration Statement also fails to disclose all specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company and any potentially interested third parties, including DraftKings, throughout the sales process, if any, would fall away.

36.     It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

***The Proposed Transaction***

37.     On August 9, 2021, DraftKings and Golden Nugget issued a joint press release announcing the Proposed Transaction.   The press release stated, in relevant part:

> **BOSTON, MA, AND HOUSTON, TX - August 9, 2021--** DraftKings Inc. (Nasdaq: DKNG) and Golden Nugget Online Gaming, Inc. (Nasdaq: GNOG) today announced that they have entered into a definitive agreement for DraftKings to acquire Golden Nugget Online Gaming in an all-stock transaction that has an implied equity value of approximately $1.56 billion. The acquisition will enable DraftKings to leverage Golden Nugget's well-known brand, iGaming product experience and existing combined database of more than 5 million customers. In connection with the acquisition, DraftKings has entered into a commercial agreement with Fertitta Entertainment, Inc., the parent company of the Houston Rockets, Golden Nugget, LLC and Landry's LLC, and a leader in the gaming, restaurant, hospitality, and sports entertainment industry.
>
> "Our acquisition of Golden Nugget Online Gaming, a brand synonymous with iGaming and entertainment, will enhance our ability to instantly reach a broader consumer base, including Golden Nugget's loyal 'iGaming-first' customers," said Jason Robins, DraftKings' CEO and Chairman of the Board. "This deal creates meaningful synergies such as increased combined company revenues driven by additional cross-sell opportunities, loyalty integrations and tech-driven product expansion as well as technology optimization and greater marketing efficiencies. We look forward to Tilman being an active member of our Board and one of our largest shareholders."

"This transaction will add great value to the shareholders as two market leaders merge into a leading global player in digital sports, entertainment and online gaming," said Tilman Fertitta, Chairman and CEO of GNOG. "Leveraging Fertitta Entertainment's broad entertainment offerings and extensive customer database, coupled with DraftKings' mammoth network makes this an unbeatable partnership. Together, we can offer value to our combined customer base that is unparalleled. We believe that DraftKings is one of the leading players in this burgeoning space and couldn't be more excited to lock arms with Jason and the DraftKings family across our entire portfolio of assets, including the Houston Rockets, the Golden Nugget casinos and Landry's vast portfolio of restaurants. This is a strong commercial agreement for both companies."

Synergies and Strategic Benefits of the Acquisition

The acquisition of Golden Nugget Online Gaming will deliver significant strategic benefits to DraftKings as well as expected synergies of $300mm at maturity. DraftKings will deploy a multi-brand strategy which will enhance cross-sell opportunities and drive increased market share and revenue growth. In addition, there will be multiple channels for cost savings by, among other things, eliminating platform costs as a result of migrating Golden Nugget's current technology to DraftKings' in-house proprietary platform, recognizing enhanced returns on advertising spend through marketing efficiencies, and reducing G&A costs such as duplicative corporate overhead. The commercial deal will also reduce DraftKings' market access rates through preferred pricing with Golden Nugget-owned properties and an exclusive commercial deal across daily fantasy sports, sportsbook and iGaming with the Houston Rockets which further solidifies the deep partnership between DraftKings and Fertitta Entertainment.

Additionally, the all-stock deal preserves DraftKings' balance sheet and aligns the long-term interests of both brands and shareholders.

Combined company revenues

DraftKings expects to see revenue uplift from additional cross-promotion opportunities, which will expand the Company's customer base by engaging a loyal iGaming-first customer. Additionally, there are anticipated revenue synergies through potential technology and game expansion, including Live Dealer offerings.

Technology optimization

By bringing Golden Nugget Online Gaming onto DraftKings' in-house technology, DraftKings expects to eliminate current Golden Nugget Online Gaming's third-party platform costs, reducing operating expenses and vendor costs. Additionally, DraftKings' technology-first approach will drive product enhancement through expanded offerings, including in-house live dealer, and an improved consumer-driven experience.

Marketing efficiencies

By streamlining marketing strategies and efforts between the two brands, DraftKings expects to realize a higher return on investment. Additionally, the agreement provides DraftKings new opportunities to deeply integrate with Fertitta Entertainment, Inc. and market to existing Golden Nugget customers through cross-selling products, in retail sportsbooks and across Fertitta Entertainment, Inc. assets. DraftKings customers will also have access to new VIP and promotional opportunities, including the ability to purchase discounted rewards and secure reservations using the DraftKings VIP rewards program, subject to a pricing agreement to be determined.

In connection with the acquisition, DraftKings has also reached an agreement regarding a separate commercial deal with Fertitta Entertainment, Inc. across its asset portfolio, including the Houston Rockets, Golden Nugget, LLC and Landry's LLC. The commercial agreement will include marketing integrations, sponsorship assets with the Houston Rockets, an expanded retail sportsbook presence, and the optionality to obtain market access on favorable terms through certain Golden Nugget casinos. DraftKings will also become the exclusive daily fantasy sports, sports betting, and iGaming partner of the Houston Rockets and intends to open a sportsbook at the Toyota Center, pending state legalization and regulatory approvals.

Details of the transaction

As part of the transaction, DraftKings will undergo a holding company reorganization and form a new holding company New DraftKings, which will become the going-forward public company for both DraftKings and GNOG. New DraftKings will be renamed DraftKings Inc. at closing ("New DraftKings").

Under the terms of the merger agreement entered into on August 9, 2021 (the "Merger Agreement"), Golden Nugget Online Gaming stockholders would receive a fixed ratio of 0.365 shares of New DraftKings' Class A Common Stock for each Common Share of Golden Nugget Online Gaming they hold on the record date (the "Exchange Ratio"). Tilman Fertitta, who owns beneficially approximately 46% of the equity in GNOG, has agreed to continue to hold the DraftKings shares to be issued to him in the merger for a minimum of one year from the closing of the transaction.

The Board of Directors of Golden Nugget Online Gaming (the "GNOG Board"), acting upon the unanimous recommendation of a committee of independent and disinterested directors established by the GNOG Board (the "Special Committee"), approved the Merger Agreement and the transaction, and resolved to recommend Golden Nugget Online Gaming's stockholders vote to approve the Merger Agreement and the transaction.

The Board of Directors of DraftKings has also approved the transaction.

The transaction is subject to approval by Golden Nugget Online Gaming stockholders, the receipt of required regulatory approvals and other customary closing conditions and is expected to close in the first quarter of 2022. The approval of the transaction by Golden Nugget Online Gaming stockholders is expected to be obtained through a written consent to be provided by Tilman Fertitta.

### *Potential Conflicts of Interest*

38.     The breakdown of the benefits of the deal indicate that Golden Nugget insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Golden Nugget.

39.     Most notably, the interests of the majority stockholder, Defendant Fertitta are clearly at odds with the public stockholders of the Company, such as Plaintiff. The former has complete control over whether the Proposed Transaction will be consummated and will receive millions of dollars' worth of consideration – the latter will be given no such luxuries.

40.     Company insiders, including the Individual Defendants, currently own large, illiquid portions of Company stock that will be exchanged for the merger consideration upon the consummation of the Proposed Transaction. Notably, while the Registration Statement provides the following information, it fails to provide an accounting of the merger consideration that these amounts will be exchanged for.

| | Shares Beneficially Owned | | | | |
|---|---|---|---|---|---|
| **Name of Beneficial Owner**(1) | **Number of Shares of GNOG Class A Common Stock** | **% of Ownership of GNOG Class A Common Stock** | **Number of Shares of GNOG Class B Common Stock** | **% of Ownership of GNOG Class B Common Stock** | **% of Total Voting Power**\*\* |
| *Greater than 5% Stockholders* | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Jefferies Financial Group Inc.(2) | 4,213,541 | 8.0 | — | — | 1.9 |
| Magnetar Financial LLC(3) | 3,399,998 | 6.5 | — | — | 1.5 |
| ***Named Executive Officers and Directors*** | | | | | |
| Tilman J. Fertitta(4) | 7,032,292 | 13.4 | 31,657,545 | 100 | 79.9 |
| Richard H. Liem | — | — | — | — | — |
| Steven L. Scheinthal | — | — | — | — | — |
| Michael S. Chadwick | 1,283 | * | — | — | — |
| G. Michael Stevens | 1,283 | * | — | — | — |
| Scott Kelly | 1,283 | * | — | — | — |
| Thomas Winter | — | — | — | — | — |
| Michael Harwell | — | — | — | — | — |
| ***Executive Officers and Directors as a group (8 persons)*** | 7,036,141 | 13.4 | 31,657,545 | 100 | 79.9 |

41.     Upon the consummation of the Proposed Transaction, each outstanding Company option, restricted stock award, or other equity award, will be canceled and converted into the right to receive certain consideration according to the merger agreement. Notably, while the Registration Statement provides the following information, it fails to provide an accounting of the merger consideration that these amounts will be exchanged for:

| Name | Number of GNOG RSUs | Market Value of GNOG RSUs ($) |
|---|---|---|
| **Executive Officers** | | |
| Tilman Fertitta | 400,000 | 7,648,000 |
| Michael Harwell | 35,000 | 669,200 |
| Thomas Winter | 1,030,457 | 19,702,338 |
| **Directors** | | |
| Richard Liem | 153,626 | 2,937,329 |
| Steven Scheinthal | 153,626 | 2,937,329 |
| Michael S. Chadwick | 3,626 | 69,329 |
| G. Michael Stevens | 3,626 | 69,329 |
| Scott Kelly | 3,626 | 69,329 |

42.     Further, certain employment agreements with certain Golden Nugget executives, entitle such executives to severance packages should their employment be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or

officer entitled to them millions of dollars, compensation not shared by Golden Nugget common stockholders.  Notably, these payments will be granted to Company insiders as follows:

| Named Executive Officer | Cash ($)(1) | Equity ($)(2) | Benefits ($)(3) | Total ($) |
|---|---|---|---|---|
| Tilman Fertitta | — | 7,648,000 | — | 7,648,000 |
| Michael Harwell | — | 535,360 | — | 535,360 |
| Thomas Winter | 3,600,000 | 15,231,169 | 44,974 | 18,876,143 |

43.     Moreover, the Registration Statement is silent as to any post-close employment agreements Company insiders may have signed with Independence. The Registration Statement must adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders

44.     Thus, while the Merger is not in the best interest of Golden Nugget stockholders, it will produce lucrative benefits for the Company's officers and directors, and especially for controlling stockholder Fertitta.

***The Materially Misleading and/or Incomplete Registration Statement***

45.     On October 8, 2021, the Defendants caused to be filed with the SEC a materially misleading and incomplete Registration Statement that, in violation of the Exchange Act, failed to provide the Plaintiff in his capacity as a Company stockholder with material information necessary to make a decision regarding whether to seek appraisal for his shares rather than accepting the consideration proffered under the terms of the Proposed Transaction and/or provides him with

materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process Leading Up to the Proposed Transaction*

46.    Specifically, the Registration Statement fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the Registration Statement fails to disclose:

a.  Adequate reasoning as to why no "majority-of-the-minority" provision was included to protect public Company stockholders' rights;

b.  Sufficient information regarding the relationships between Defendant Fertitta and/or his affiliated companies and the so-called independent members of the special committee;

c.  Adequate reasoning as to why the Proposed Transaction did not include a collar mechanism to keep the merger consideration payable to public Company stockholders within a realm of reasonableness;

d.  Adequate reasoning as to why only two potentially interested counterparties other than DraftKings were contacted by the Company or anyone on its behalf during the sales process;

e.  Adequate reasoning as to why the Company engaged two separate financial advisors;

f.  Sufficient information regarding Jefferies' engagement, including the amount of consideration paid or promised to Jefferies by the Company for services

relating to the Proposed Transaction and whether Jefferies delivered a written fairness opinion to the Board;

g.  The specific nature of all non-disclosure agreements entered into by the Company as part of the sales process, including with Independence, the specific terms of all standstill restrictions contained in each agreement, including all specific conditions, if any, under which such provisions would fall away, and all specific differences between the entered into confidentiality agreements and the reasoning as to why they differed from one another; and

h.  To adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

*Omissions and/or Material Misrepresentations Concerning Golden Nugget's and DraftKings' Financial Projections*

47.    The Registration Statement fails to provide material information concerning financial projections provided and/or adjusted by Golden Nugget management and DraftKings management and relied upon by SGC, Jefferies, and Raine in their analyses. The Registration

Statement discloses management-prepared financial projections for which are insufficient and/or are materially misleading.

48.    Accordingly, the Registration Statement should have, but fails to provide, certain information in the projections that Golden Nugget management and DraftKings management provided to the Board, SGC, Jefferies, and Raine. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

49.    With respect to Golden Nugget Projections provided, the Registration Statement fails to disclose material line items for the following metrics:

   a.    Gross Gaming Revenue, including all underlying metrics, inputs, and assumptions, including specifically: the total amounts wagered by GNOG players, less total payouts to GNOG players for winnings on such wagering; and

   b.    Adjusted EBITDA( including all underlying metrics, inputs, and assumptions, including specifically: earnings (or loss), interest, taxes, depreciation, and amortization, and the specific adjustments made for stock-based compensation, acquisition transaction-related expenses, gains or losses on warrant derivative liabilities, debt extinguishment expenses and other non-cash or non-recurring items.

50.    The Registration Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the Golden Nugget projections.

51.     In addition, despite the merger consideration being composed entirely of DraftKings stock, the Registration Statement fails to provide any projection information for DraftKings whatsoever.

52.     This information is necessary to provide Plaintiff in his capacity as a Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, Plaintiff as not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the sales process and whether or not to vote in favor of the Proposed Transaction.

53.     Without accurate projection data presented in the Registration Statement, Plaintiff is unable to properly evaluate the Company's true worth, DraftKings' true worth (and as such the true worth of the proffered merger consideration) the accuracy of SGC's financial analyses, or make an informed decision whether to seek appraisal for his shares rather than accepting the consideration proffered under the terms of the Proposed Transaction.  As such, the Board has violated the Exchange Act by failing to include such information in the Registration Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by SGC*

54.     In the Registration Statement, SGC describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinion.

55.     With respect to the *Trading Multiples of Comparable Public Companies Analysis*, the Registration Statement fails to disclose the following:

    a.  The specific metrics for each analyzed comparable company, as well as all requisites inputs and assumptions therein;

    b.  The specific inputs and assumptions used to determine the utilized 2021 estimated Forward Revenue multiples of 4.0x to 12.0x; and

    c.  The specific inputs and assumptions used to determine the utilized 2022 estimated Forward Revenue multiples of 3.0x to 10.0x.

56.    With respect to the *Selected Precedent Transaction Analysis*, the Registration Statement fails to disclose the following:

    a.  The specific inputs and assumptions used to determine the utilized Forward Revenue multiples of 3.0x to 8.0x;

    b.  The specific date on which each precedent transaction closed; and

    c.  The value of each precedent transaction analyzed.

57.    With respect to the *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose the following:

    a.  The specific inputs and determinations upon which the assumption that "GNOG's estimated Adjusted EBITDA amounts were equivalent to GNOG's free cash flow" was based;

    b.  The specific inputs and assumptions used to determine the utilized terminal multiple range of 9x to 11x;

    c.  The specific inputs and assumptions used to determine the applied discount rate range of 7.2% to 11.2%;

    d.  The utilized weighted average cost of capital for Golden Nugget;

    e.  The utilized cost of equity for Golden Nugget;

      f.   The utilized net debt for Golden Nugget; and

      g.   The specific inputs and assumptions used to determine the utilized sensitivity terminal multiple range of 12x to 18x.

58.     In addition the Registration Statement fails to provide any financial analyses, if any, which were performed by Jefferies and/or Raine.

59.     These disclosures are critical for Plaintiff in his capacity as a Company stockholder to be able to make an informed decision on whether to seek appraisal for his shares rather than accepting the consideration proffered under the terms of the Proposed Transaction.

60.     Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves his interests.  Moreover, without the key financial information and related disclosures, Plaintiff in his capacity as a Company public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests.  As such, the Board has violated the Exchange Act by failing to include such information in the Registration Statement.

## FIRST COUNT

### Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

61.     Plaintiff repeats all previous allegations as if set forth in full herein.

62.     Defendants have disseminated the Registration Statement with the intention of soliciting stockholders, including Plaintiff, to seek appraisal for his shares rather than accepting the consideration proffered under the terms of the Proposed Transaction.

63.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

64.     As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any Registration Statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

65.     The Registration Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that

the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

66.     The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

67.     The Individual Defendants were at least negligent in filing a Registration Statement that was materially misleading and/or omitted material facts necessary to make the Registration Statement not misleading.

The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to seek appraisal for his shares rather than accepting the consideration proffered under the terms of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the consummation of the Proposed Transaction.

WHEREFORE, Plaintiff demands injunctive relief, in his favor, and against the Defendants, as follows:

A.     Enjoining the Proposed Transaction;

B.     Directing the Individual Defendants to comply with the Exchange Act and disseminate an Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

C.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

D.     Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: November 11, 2021

**BRODSKY & SMITH, LLC**

By: _____
Evan J. Smith
240 Mineola Boulevard
Mineola, NY  11501
Phone (516) 741-4977
Facsimile (561) 741-0626

*Counsel for Plaintiff*